[Cite as *State v. Simpson*, 2012-Ohio-3195.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.    11CA010138 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| NEIL SIMPSON | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No.    07CR073994 |

DECISION AND JOURNAL ENTRY

Dated: July 16, 2012

WHITMORE, Presiding Judge.

{¶1}   Defendant-Appellant, Neil Simpson, appeals from his convictions in the Lorain County Court of Common Pleas.  This Court affirms.

I

{¶2}   Shortly before midnight on June 23, 2007, David Kowalczyk, the owner of Granny D's pizza in Lorain, and two other women were chatting in a room behind the restaurant's counter.  A masked man then entered the store, leapt over the counter, pulled a 9mm Smith & Wesson semiautomatic gun from his waistband, cocked the gun, aimed it at Kowalczyk's head, and fired once, killing him instantly.  Afterwards, the shooter took money from the register at Granny D's and fled.  The two women, one of whom was Theresa Davis, called 911 and hid until the police arrived.  After speaking with Davis, the police identified Simpson as a person of interest in the shooting.  Other witnesses later came forward and provided the police with information that led to Simpson's arrest.

{¶3}    Simpson ultimately went to trial before a jury on each of the following charges: (1) two counts of aggravated murder, in violation of R.C. 2903.01(A) and 2903.01(B); (2) two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1) and 2911.01(A)(3); (3) two counts of murder, in violation of R.C. 2903.02(A) and 2903.02(B); (4) felonious assault, in violation of R.C. 2903.11(A)(2); and (5) tampering with evidence, in violation of R.C. 2921.12(A).   Both of the aggravated murder counts contained capital specifications, and the majority of the remaining counts contained firearm specifications.   The jury found Simpson guilty on all counts, but declined to impose a sentence of death upon him.   The trial court then sentenced Simpson to life in prison.

{¶4}    Simpson appealed from his convictions, but this Court dismissed his appeal by way of journal entry because his sentencing entry did not specify the amount of restitution Simpson was to pay.   *See State v. Simpson*, 9th Dist. No. 10CA009860 (Sept. 7, 2011).   After this Court's dismissal, the trial court issued a new sentencing entry in which it sentenced Simpson to life in prison and imposed a specific amount of restitution.   Simpson now appeals from his convictions and raises three assignments of error for our review.

II

Assignment of Error Number One

THE VERDICTS ARE AGAINST THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF MR. SIMPSON'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶5}    In his first assignment of error, Simpson argues that his convictions for aggravated murder, aggravated robbery, and tampering with evidence are based on insufficient evidence.  We disagree.

**{¶6}** In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

**Prior Calculation and Design**

**{¶7}** To commit aggravated murder in violation of R.C. 2903.01(A), an offender must purposely, "and with prior calculation and design, cause the death of another." Simpson argues that the State failed to prove prior calculation and design. "[T]he phrase 'prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Patel*, 9th Dist. No. 24030, 2008-Ohio-4693, ¶ 33, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997).

> [T]he phrase [] require[s] evidence of more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill. While [n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, momentary deliberation is insufficient.

> Nevertheless, where the evidence presented at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

(Internal citations and quotations omitted.) *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 38-39. "[A] prolonged period of deliberation is [] unnecessary." *State v. Hairston*, 9th Dist. No. 05CA008768, 2006-Ohio-4925, ¶ 80, quoting *Taylor v. Mitchell*, 296 F.Supp.2d 784, 820 (N.D.Ohio 2003).

{¶8} This Court has recognized that several factors may guide a prior calculation and design analysis, given that no bright-line test exists. *Hairston* at ¶ 81-82. Those factors include any prior relationship between the accused and the victim, the apparent level of thought the accused put into a choice of murder weapon or location, "whether the killing was drawn out or an instantaneous eruption of events," any expressed desire to kill on the part of the accused, any time the accused might have had to stop and reflect during the incident, the choice of the accused to immediately display a weapon and/or retrieve it at any point once the encounter ensued, any pursuit of the victim in which the accused engaged, and the number of shots fired. *Id.* The factors must then "be weighed in concert with the totality of the circumstances surrounding the murder." *Id.* at ¶ 82.

{¶9} Theresa Davis testified that she knew Simpson and his family because they all lived on the same street and the Simpsons rented their home from Davis' parents. Davis became close friends with Simpson's younger sister and met Simpson for the first time approximately eight years before the shooting occurred. In 2006, Davis took a job as an assistant cook at Granny D's, a neighborhood pizza parlor owned by the victim, David Kowalczyk. Davis and the victim later became romantically involved. Davis mainly kept her relationship from others due to the substantial age gap between her and Kowalczyk, but confided in her close friend Nicole, Simpson's younger sister. Davis testified that Simpson called her the day before for the shooting and asked her for a date. Previously, Simpson had expressed an interest in Davis, but had never

actually asked her on a date. When Davis rejected Simpson's date offer, Simpson inquired whether she had rejected him "because of Dave."

{¶10} The following evening, Davis decided to introduce another of her friends, Alison Hornak, to Kowalczyk. The two walked to Granny D's around 11:00 p.m. and chatted with Kowalczyk in the pizza preparation room located behind the counter. As the three were speaking, a man entered the pizza shop. Davis testified that the man jumped over the counter, walked up to Kowalczyk, pulled a gun from the waistband of his pants, cocked the gun, held it up to the left side of Kowalczyk's head, and fired once, killing Kowalczyk. Davis then grabbed Hornak and pulled her to the back of the store where the two called 911 from a cell phone and hid until the police arrived. According to Davis, the shooter never spoke during the incident; he simply fired. Both Davis and Hornak testified that the shooter's face was covered throughout the incident.

{¶11} Scotty Parker testified that had known Simpson for about three or four years at the time of the shooting and was with Simpson in Simpson's car on the night of the shooting. Simpson drove Parker and two other men to the east side of Lorain and parked the car. Parker testified that he did not know the name of the street on which Simpson parked, but that Simpson got out of the car and said he was "going to get some money." Parker understood this to mean that Simpson was going to rob someone. Several minutes later, Parker saw Simpson running toward the car wearing a mask and holding a gun, a pair of gloves, and paper money. When Simpson reentered the car, he told Parker that he "popped somebody." Parker understood this to mean that Simpson had shot someone. According to Parker, Simpson always carried a 9mm Smith & Wesson with him.

{¶12} Crystal Rodriguez, an acquaintance of Simpson's, testified that she rode in Simpson's car two days before the shooting and discovered a silver and black gun tucked inside a sweatshirt in the car's backseat. Rodriguez identified the gun as the murder weapon the State produced at trial. Moreover, ballistic testing later performed by firearms examiner, Mitchell Wisniewski, disclosed that the bullet extracted from the victim was consistent with having been fired from the same silver and black 9mm Smith & Wesson that Rodriguez recognized.

{¶13} Two other witnesses testified that they saw Simpson with a gun on June 16, 2007, one week before the shooting. Stephanie Smith-Pinskey and her husband Jason patronized a bar in Lorain on the night of June 16th when Simpson approached Jason. Stephanie looked over at Simpson and saw a gun tucked into the waistband of his pants. Stephanie described the gun as black with brushed-nickel on it and recognized the gun the State produced at trial as the one she saw Simpson carrying that night. Jason described the gun as a black handle, brushed nickel, semiautomatic, and also identified the gun the State produced at trial as the one Simpson had tucked into his waistband. Stephanie testified that she spoke with Simpson at the bar to tell him that the bar was a nice establishment and that its occupants did not need any kind of trouble. According to Stephanie, Simpson replied that she did not need to worry about him because he "shoot[s] to kill." Stephanie later recognized Simpson as the man she and her husband had encountered at the bar when she saw his face in the newspaper in connection with the Granny D's shooting.

{¶14} Jose Rivera testified that he shared a jail pod with Simpson after Simpson was arrested for shooting Kowalczyk. Rivera knew Simpson from his neighborhood growing up and also knew the victim, having bought pizza at Granny D's throughout his youth. Rivera testified that Simpson confessed to having committed the murder. Specifically, Simpson told Rivera that

he went through the front door of Granny D's, jumped over the counter, shot Kowalczyk, and took money from the store before leaving and running through an alley. Simpson also said that he wore white gloves when he committed the crimes at Granny D's.

{¶15} Simpson argues that the State failed to prove prior calculation and design because there was no evidence that (1) he and Kowalczyk knew each other, (2) he gave any thought to selecting a murder site, or (3) the shooting was anything more than "a spontaneous eruption of events during a robbery." While it is unclear whether Kowalczyk knew Simpson, the State introduced evidence that Simpson knew Kowalczyk. Granny D's had been a fixture in Simpson's neighborhood for some time and was located within walking distance of Davis' and Simpson's houses. Moreover, Davis testified that, when she rejected Simpson's date offer, he asked her if she did so "because of Dave." Thus, the State introduced evidence that Simpson knew who Kowalczyk was and that Kowalczyk and Davis were romantically involved with one another. Simpson specifically asked Davis about her relationship with Kowalczyk the night before the shooting.

{¶16} Several witnesses testified that Simpson had the gun the State identified as the murder weapon with him before the shooting. Two witnesses saw the gun tucked into Simpson's waistband the week before the shooting, and Davis saw the shooter pull the same gun from his waistband directly before shooting Kowalczyk. The shooter also cocked the gun before firing at Kowalczyk, thus ensuring that a round was chambered. Further, the shooter aimed the gun directly at Kowalczyk's head and fired it without hesitation. Dr. Paul Matus, the Lorain County Coroner, testified that stippling around the entrance wound indicated that the shooter held the gun less than a foot away from Kowalczyk's head before firing it. Kowalczyk's murder took

place only one week after Simpson told another witness not to worry about him because he "shoot[s] to kill."

{¶17} The State also presented evidence that Simpson drove his car to a specific location before parking it and telling his friend that he was "going to get some money." Simpson's friend from the car that night and a friend from his jail pod both testified that Simpson admitting to shooting someone. Specifically, Simpson admitted to Rivera while in jail that he shot Kowalczyk.

{¶18} Viewing all the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State presented sufficient evidence of prior calculation and design. There was evidence of a relationship between Simpson and the victim, Simpson had the murder weapon with him at least a week before the shooting occurred, he described himself as a person who shoots "to kill," and he drove directly to the area in which Granny D's was located on the night of the killing. *See Hairston*, 2006-Ohio-4925, at ¶ 82. The fact that the murder occurred quickly does not support the conclusion that the State failed to prove prior calculation and design. Indeed, the manner of the shooting here exudes calculation. The shooter directly entered the store, jumped over its counter, cocked his gun, fired a single shot into the victim's head without hesitation, and left without harming Davis or Hornak. Prior calculation and design must be considered in light of the "totality of the circumstances surrounding the murder." *Id.* Based on the totality of the circumstances, a rational trier of fact could have determined that the State set forth sufficient evidence of prior calculation and design.

**Commission or Attempted Commission of a Theft Offense**

{¶19} Aggravated murder in Ohio also may be committed by way of a felony murder. R.C. 2903.01(B). R.C. 2903.01(B) provides, in relevant part, that "[n]o person shall purposely

cause the death of another * * * while committing or attempting to commit * * * aggravated robbery * * *." R.C. 2911.01 defines aggravated robbery. Specifically:

No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall * * *:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; [or]

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

R.C. 2911.01(A)(1), (3). The phrase "theft offense" refers to any violation of the enumerated statutes set forth in R.C. 2913.01(K), including a violation of the theft statute, R.C. 2913.02. Under R.C. 2913.02(A)(1), "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over [] the property * * * [w]ithout the consent of the owner * * *.

{¶20} Simpson argues his aggravated murder conviction under R.C. 2903.02(B) and his aggravated robbery convictions are based on insufficient evidence because the State failed to prove that he committed a theft offense. According to Simpson, there was no evidence that the cash register at Granny D's contained any money.

{¶21} Davis testified that when she and Hornak finally left their hiding place in Granny D's after the police arrived, she noticed that the cash register was no longer on its spot on the counter. Detective Denman testified that the register had been knocked to the floor and, when the police dusted for fingerprints, they discovered a "dot pattern" on the register that looked as if it had been left by gloves. The register also had been damaged. Detective Denman explained that several of its keys were missing, the cord was stretched to its limit, and the top portion of the

register had broken off. Detective Denman testified that the register only contained some change and a menu. The police did not find any paper money in the register.

{¶22} As previously noted, Scotty Parker testified that Simpson was carrying paper money in his hand when he ran back to the car. Parker also testified that, before Simpson exited the car, he made a statement that Parker understood to mean Simpson was going to rob someone. Another witness, Justin Cisar, also saw Simpson with the money in his hand while he ran. Cisar testified that he and his friends were walking in an alley behind Granny D's on the night of the shooting and noticed a car parked in the alley with its engine running. Cisar then saw a man running in his direction. The man had his face covered, was wearing white gardening gloves, and had paper money in his hand.

{¶23} Given the foregoing testimony, the jury could have determined that the State provided sufficient evidence that Simpson committed a theft offense, and thus, committed both aggravated robbery and aggravated felony murder. Neither Davis, nor Hornak testified that the shooter was holding money when he entered Granny D's. The State presented evidence that the register was knocked to the floor and broken open as a result of the shooting. The State also presented evidence that two different people saw Simpson running with money in his hands, a mask, and gloves in the timeframe immediately following the shooting in the location of the shooting. Viewing the evidence in a light most favorable to the State, Simpson's argument that his aggravated robbery and aggravated felony murder convictions are based on insufficient evidence lacks merit.

**Tampering**

{¶24} "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record,

document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1). "The mere fact that a gun was removed from a crime scene does not support an inference that it was taken to impair its value or availability as evidence." *State v. Lollis*, 9th Dist. No. 24826, 2010-Ohio-4457, ¶ 30. Nevertheless, the State need not produce direct evidence to obtain a tampering conviction. *See State v. Michel*, 9th Dist. No. 25184, 2011-Ohio-2015, ¶ 16-19. Circumstantial evidence may suffice. *See State v. West*, 9th Dist. No. 22839, 2006-Ohio-2985, ¶ 10-12.

{¶25} After Simpson returned to his car following the shooting, Parker testified that Simpson stopped at a gas station, but then proceeded to drive to a friend's house. The friend, Jeff Blinco, lived on Root Road. Simpson drove into Blinco's driveway with his car's headlights off, parked the car, and left for approximately two minutes. When Simpson returned to the vehicle, he informed Parker that he had "got[ten] rid of something." Parker testified that he did not see Simpson's gun in the car at that point, so he thought Simpson might have taken the gun with him when he left the car. The police executed a search warrant at Blinco's residence on the afternoon of June 26, 2007, less than three days after the shooting. Sergeant Albert Rivera testified that he found a 9mm Smith & Wesson in the shrubs at Blinco's address along with a partially loaded magazine that had been removed from the gun. As previously noted, future ballistics testing confirmed that the bullet removed from the victim was consistent with having been fired from the gun that Sergeant Rivera found. Several witnesses also testified that they saw Simpson with the black and silver 9mm Smith & Wesson in the days before the shooting.

{¶26} Simpson argues that his tampering conviction is based on insufficient evidence because no one actually saw him place the 9mm Smith & Wesson in Blinco's yard. He relies upon *State v. Wooden*, 86 Ohio App.3d 23 (9th Dist.1993), in which this Court reversed a

tampering conviction on sufficiency grounds. In *Wooden*, the police were only able to recover two of three guns involved in a shooting incident, during which Wooden and three other men fled from the police. There was testimony that the police saw Wooden fire a gun. Further, there was testimony that the ballistics tests later performed on the shot Wooden fired was not consistent with either of the two guns the police actually recovered. In reversing Wooden's tampering conviction, this Court noted that many possibilities existed as to the whereabouts of the third gun, but the mere fact that the police could not find it "[did] not necessarily show that [Wooden] tampered with it." *Wooden* at 27.

{¶27} *Wooden* is distinguishable from the case at hand. Here, the police were able to recover the gun linked to Kowalczyk's murder. Parker, one of the occupants of Simpson's vehicle, testified that Simpson drove to Jeff Blinco's Root Road residence after the shooting, drove up Blinco's driveway with the car's headlights off, left the car for about two minutes, and stated when he returned that he had "got[ten] rid of something." This is not a case where the State pursued tampering charges simply because a gun was removed from a crime scene. *Compare Lollis*, 2010-Ohio-4457, at ¶ 30-31. Several witnesses saw Simpson with the 9mm Smith & Wesson directly before the shooting, there was testimony that he drove to Blinco's Root Road residence after the shooting, and the police recovered the gun from some shrubs at the residence less than three days after the shooting. Viewing the evidence in a light most favorable to the State, the State produced circumstantial evidence from which a rational trier of fact could conclude that Simpson purposely concealed the gun after the murder to impair its availability as evidence. *See* R.C. 2921.12(A)(1). His argument that his tampering conviction is based on insufficient evidence lacks merit. Simpson's first assignment of error is overruled.

Assignment of Error Number Two

THE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. SIMPSON'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶28}** In his second assignment of error, Simpson argues that his convictions are against the manifest weight of the evidence. Specifically, he argues that little forensic evidence linked him to the charges and the witnesses who testified gave self-serving and/or conflicting testimony. We disagree.

**{¶29}** In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

**{¶30}** Davis testified that there was no doubt in her mind that Simpson shot Kowalczyk. Davis lived across the street from Simpson for several years before the shooting and was close

friends with his sister. Davis testified that she knew Simpson was the shooter in spite of the mask he wore because Simpson had a very distinctive walk. Davis described Simpson's walk as a "ghetto limp" and stated that she had "watched him walk down the street like [that] half [her] life." She also confirmed that the shooter's build was consistent with Simpson's.

{¶31} When viewed together, Justin Cisar's and Scotty Parker's testimony placed Simpson in the alley behind Granny D's the night of the shooting. Cisar, a young man who did not personally know Simpson, testified that he and his friends were walking in the alleyway behind Granny D's when he saw a masked man wearing gloves and carrying money run toward him and then directly past him. Cisar described the man's gloves as white gardening gloves with dots on them. He also recalled seeing three men in a parked car in the alley. Parker testified that he was one of the three men in the parked car, which belonged to Simpson. Parker testified that Simpson parked the car in that location and, when Simpson later returned to the car, he was holding a mask, money, and a gun. Simpson also told Parker that he had shot someone. The 9mm Smith & Wesson later identified as the murder weapon was linked to Simpson through multiple witnesses. Moreover, Rivera, Simpson's cellmate during his jail stay, testified that Simpson confessed to having murdered Kowalczyk. Rivera testified that he did not receive any deals from the State in exchange for his testimony.

{¶32} In addition to Cisar and Parker testifying that Simpson had gloves with him when he ran through the alley, the other witness to the actual shooting, Alison Hornak, testified that she recalled the shooter having something white on his hands. When the police later executed a search warrant at Simpson's residence, they found a pair of white gardening gloves with brown dots on them in the garage. David Green, a criminalist for the Lake County Crime Lab, performed a fabric impression analysis by comparing the gloves to the dot pattern impression the

police found on the register at Granny D's when they dusted for fingerprints. Green testified that the pattern on the gloves from Simpson's garage was consistent with the pattern found on the register. The gloves also were consistent with the description Cisar gave of the gloves the man running through the alley wore.

{¶33} Based on our review of the record, we cannot conclude that the jury lost its way in convicting Simpson. Multiple witnesses place him at the scene of the crime and linked the murder weapon to him, as well as the white gloves. Davis had interacted with and observed Simpson for years prior to the shooting. She also indicated that Simpson called her and questioned her about her relationship with Kowalczyk the day before the shooting. The record reflects that this is not the exceptional case in which the jury clearly lost its way. *See Otten*, 33 Ohio App.3d at 340. Simpson's second assignment of error is overruled.

Assignment of Error Number Three

> APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶34} In his third assignment of error, Simpson argues that he received ineffective assistance of counsel. We disagree.

{¶35} To prove an ineffective assistance claim, Simpson must show two things: (1) that counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, Simpson must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "An error by counsel, even if

professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691. Furthermore, this Court need not address both *Strickland* prongs if an appellant fails to prove either one. *State v. Ray*, 9th Dist. No. 22459, 2005-Ohio-4941, ¶ 10.

**{¶36}** Simpson claims that he received ineffective assistance of counsel because his counsel failed to respond appropriately when two witnesses implicated Simpson in other criminal activity. Before trial, the trial court granted a motion in limine, preventing the State from referencing Simpson's alleged involvement in another shooting that was the subject of a different criminal case. When Scotty Parker testified and described Simpson's behavior when Simpson returned to his car after the shooting, the following exchange took place:

[PROSECUTOR:] Did [Simpson] say anything to you at this point?

[PARKER:] He said he popped somebody. He popped somebody.

[PROSECUTOR:] And what does that mean?

[PARKER:] That he shot somebody again.

Defense counsel did not object when Parker testified that Simpson shot someone "again," and the prosecutor moved on without reference to that portion of Parker's answer. Several questions later, defense counsel asked for a sidebar. At the sidebar, defense counsel placed on the record that he had heard Parker's answer, but did not want to object or move to strike it because he believed that would draw even more attention to it. Defense counsel agreed that a curative instruction would be a better way to handle the situation. The court later gave a curative instruction at the end of Parker's testimony, after a juror asked a question related to Simpson's criminal history.[1] Both counsels discussed the instruction with the court before the court issued it. The court then instructed the jury that, despite a possible reference about "any other alleged

---

[1] The trial court permitted the jurors to submit written questions after each testifying witness.

unlawful acts by [Simpson,] * * * [y]ou are not to consider that evidence for any reason whatsoever."

{¶37} Strategic decisions by defense counsel, including the decision not to object to certain testimony, fall within the realm of trial tactics and do not establish ineffective assistance of counsel. *State v. Bedford*, 9th Dist. Nos. 25048 & 25066, 2010-Ohio-3577, ¶ 29. The record reflects that Simpson's counsel deliberately chose not object to Parker's answer because he did not want to draw further attention to it. Instead, defense counsel waited a short period of time before bringing the matter to the court's attention and then later worked with the court to form a curative instruction for the jurors. Moreover, the court specifically instructed the jury not to consider any portion of Parker's testimony in which he alleged any other unlawful acts by Simpson. "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Simpson has not shown that he received ineffective assistance of counsel as a result of his trial counsel's tactical decision not to draw attention to Parker's quoted testimony.

{¶38} Next, Simpson avers that his trial counsel failed to respond appropriately to certain testimony offered by Sergeant Albert Rivera. Sergeant Rivera was responsible for collecting the white gardening gloves with dots from Simpson's residence when the police executed a warrant there. During Sergeant Rivera's direct examination, the following testimony emerged:

> [PROSECUTOR:] Was there a reason why you were collecting gloves during the search warrant?
>
> [SERGEANT RIVERA:] Yes. There was evidence at various crime scenes that depicted this type of glove, work glove with dotted print pattern to them.

[PROSECUTOR:] I want to stick specifically to Granny D's. Was there a reason you were correspondingly choosing gloves that had dotted patterns with regard to Granny D's?

[SERGEANT RIVERA:] Yes.

[PROSECUTOR:] And that was part of the scope of the search warrant originally?

[SERGEANT RIVERA:] Yes.

Defense counsel did not object to the foregoing testimony. Instead, he focused his cross-examination on the popularity of the type of gardening gloves the police found and the fact that it is not uncommon for people to keep the same type of glove the police found in their garages. When both attorneys finished their examinations, none of the jurors asked any questions related to Sergeant Rivera's testimony that the same glove pattern was found "at various crime scenes."

{¶39} We do not agree with Simpson's assertion that Sergeant Rivera's testimony equated to testimony that Simpson actually committed separate offenses with the gardening gloves. *Compare State v. Dute*, 1st Dist. No. C-020709, 2003-Ohio-2774, ¶ 21 ("Where the jury becomes aware of 'highly prejudicial' evidence of the defendant's past criminal behavior through news media coverage, it is per se prejudicial to the defendant."). To the extent Sergeant Rivera referenced "various crime scenes," he did not elaborate any further. Moreover, the State immediately directed his testimony back to this specific case. Rather than object and draw further attention to Sergeant Rivera's comment, defense counsel instead relied upon cross-examination. During cross-examination, defense counsel successfully got Sergeant Rivera to testify that the type of gloves the police found are common, anyone in the city might own a similar pair of gloves, and he himself kept gloves in his garage. Having reviewed the record, we cannot conclude that defense counsel's handling of the situation amounted to ineffective

assistance of counsel. *See Bedford*, 2010-Ohio-3577, at ¶ 29. Simpson's third assignment of error is overruled.

III

{¶40} Simpson's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.


BETH WHITMORE
FOR THE COURT

CARR, J.
BELFANCE, J.
CONCUR.


APPEARANCES:

PAUL A. GRIFFIN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and BILLIE JO BELCHER, Assistant Prosecuting Attorney, for Appellee.