[Cite as *State v. Simpson*, 2013-Ohio-4276.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. Nos. | 12CA010147 |
| | | 12CA010148 |
| Appellee | | |
| | | |
| v. | | APPEAL FROM JUDGMENT |
| | | ENTERED IN THE |
| NEIL J. SIMPSON | | COURT OF COMMON PLEAS |
| | | COUNTY OF LORAIN, OHIO |
| Appellant | | CASE Nos. 07CR073809 |
| | | 07CR074609 |

DECISION AND JOURNAL ENTRY

Dated: September 30, 2013

---

CARR, Judge.

{¶1} Appellant, Neil Simpson, appeals from his convictions in the Lorain County Court of Common Pleas of kidnapping, felonious assault, having weapons under disability, and two counts of aggravated robbery. Some of his convictions also included firearm and/or repeat violent offender specifications. This Court affirms.

I.

{¶2} Simpson's convictions in this case stem from two separate armed robberies in Lorain, Ohio on June 16 and 21, 2007. In a separate case, he was convicted of aggravated murder, aggravated robbery, and other crimes for his involvement in a third incident at Granny D's Pizza in Lorain on June 23, 2007. This Court affirmed those convictions on appeal. *State v. Simpson*, 9th Dist. Lorain No. 11CA010138, 2012-Ohio-3195. Although Simpson's convictions stemming from his acts at Granny D's are not at issue in this appeal, some evidence about that incident was admitted at his trial in this case.

**June 16 – Chapman's**

{¶3} On June 16, 2007, at approximately 10:00 p.m., a masked gunman entered Chapman's Food Mart in Lorain and ordered the clerk to give him the money in the cash register. Todd Schill was a customer in the store who was on his way home from working as a security guard and was still dressed in his uniform and armed with a gun. Schill reached for his gun, but the masked man pointed his gun directly at Schill's head and warned, "Don't do it, cop." Schill complied with the gunman's order to lie down on the floor, where the gunman removed his gun and handcuffs. The gunman ordered a female customer to handcuff Schill, which she did. The gunman then took the female customer's money and successfully fled the area.

{¶4} Witness statements and surveillance video from Chapman's depicted the gunman as approximately five foot nine to five foot eleven inches tall, of slender build, and wearing baggy clothes. He wore tan cargo shorts, a gray hoodie, dark fabric over his face up to his eyes, white work gloves, and black shoes. While lying on the ground next to the gunman, Schill had also observed that he had a tattoo with a swirl design on his left calf. Because Schill was familiar with guns, he was also able to describe the gunman's weapon as a stainless steel semi-automatic gun with a black handle.

**June 21 – Jack and Diane's**

{¶5} On June 21, 2007, a masked gunman entered Jack and Diane's Lounge in Lorain, and demanded money, which he stuffed into the front of his hoodie. He also stole a black purse that was sitting on the counter of the bar. During the robbery, a woman who was working at the bar that night grabbed a pole and hit the gunman from behind and knocked him to the ground. As the gunman got back up to his feet, Jason Reichert, a patron at the bar, charged him and the two struggled. During the struggle, the gun went off, striking Reichert in the abdomen. The

gunman again fled the scene and was not apprehended. Witnesses and surveillance video depicted the gunman as being of average height and dressed entirely in dark clothing, including jeans, a hoodie, gloves, shoes, and a mask over his face.

### June 23 – Granny D's

{¶6} On June 23, 2007, a masked gunman came into Granny D's Pizza in Lorain and jumped over the counter near the cash register. In addition to taking money from the cash register, the gunman pointed his gun at the head of the man who was working behind the counter. Two women who were standing nearby saw the gunman fatally shoot the man and flee the scene, but they lost sight of him after he ran out of the building. Although the witnesses were unable to describe the gunman's clothes in much detail, they agreed that he was completely covered except his eyes. One witness recalled that he wore a sweater-type material over his face and something white on his hands.

{¶7} Because the three incidents had been committed within the same week in the city of Lorain and had been committed in a similar manner, the police believed that the same man had committed each crime and their investigation focused on identifying the gunman. Information from various sources eventually implicated Simpson as the gunman who had been aided in one or more of the incidents by three acquaintances: Scotty Parker, Richar Perry, and Chuckie Leonard. Initially, none of the men admitted any involvement in the incidents, but Leonard and Parker later implicated Simpson as the gunman in each incident and themselves and Perry as accomplices in one or more of the incidents.

### Evidence Implicating Simpson

{¶8} Parker and Leonard told the police that, prior to the Chapman's robbery, Simpson drove them and Perry in his maroon or "reddish" minivan and parked at an abandoned building

near Chapman's. Simpson was wearing cargo shorts, put on gloves and a mask, and went into Chapman's while the other three waited in the minivan. After Simpson ran back from Chapman's, the four men fled the scene in Simpson's minivan. Leonard told the police that, although he did not see Simpson with a gun that night, he knew that Simpson had a gun that was chrome and black.

{¶9} Several witnesses told the police that all four men went to Timber's Bar in Amherst after the Chapman's robbery, where they bought shots of expensive liquor. While there, Simpson was observed with a gun sticking out of his pants and was asked to take it out of the bar, which he did. A patron who had been at Timber's that night told police that she had seen all four men in the bar and also saw them standing in the parking lot near a maroon minivan. She also recalled that Simpson had been wearing tan/brown cargo shorts and a black tank top and that he had a silver and black gun. When she spoke to him briefly, he showed her the tattoos on his upper arm, which included a picture of a swastika and the words "White Power." Police later confirmed that Simpson had tattoos with a swastika and "White Power" on his upper arm and that he also had a swirl-patterned tattoo on his left calf, as had been observed by Todd Schill during the Chapman's robbery. None of Simpson's three friends had similar tattoos.

{¶10} Lorain Police later learned that, during the early morning hours after the Chapman's robbery, Simpson had been involved in an automobile collision in Amherst. The police cruiser's dash cam video depicted Simpson's red minivan and Simpson wearing a black tank top, tan cargo shorts, and black shoes. The police officer who responded to the accident explained that, although he noticed the smell of alcoholic beverage and Simpson admitted that he had been drinking earlier, Simpson passed field sobriety and breathalyzer tests and was not charged with an alcohol-related offense.

{¶11} Because Simpson's red minivan was damaged extensively, it had to be towed from the scene, so the police officer searched the vehicle before it was towed. Although he found no weapon in Simpson's vehicle, the officer did find a light-colored sweatshirt and white gloves. Simpson was also carrying a folded wad of paper money that was approximately one inch thick. Because the officer had no reason to believe at that time that the items in Simpson's possession were connected to criminal activity, he did not take Simpson into custody and cited him only for a traffic offense for causing the collision. After receiving an alert about the Chapman's robbery suspect, however, Amherst police contacted the Lorain Police Department.

{¶12} The evidence identifying Simpson as the gunman at Jack and Diane's came primarily from Simpson's accomplices and acquaintances. Parker told police that, during the Jack and Diane's robbery, he and Perry again waited nearby in Simpson's vehicle while Simpson went into the bar masked and armed. Simpson drove a different vehicle that day, which was a white Nissan that he rented after he crashed his red minivan. Although Parker and Perry initially drove away from the scene without Simpson when they heard sirens, they picked him up a few blocks away after they connected via cell phone. Although Leonard was not with the three men that evening, he told police that Simpson later bragged to him about committing the Jack and Diane's robbery and shooting someone in the stomach.

{¶13} Police later recovered physical evidence connected to the Jack and Diane's robbery hidden in a trash can at the home where Parker was living at the time. Those items included the purse taken from Jack and Diane's, dark jeans, and dark gloves. The jeans and gloves both tested positive for gunshot residue. The police had received an anonymous tip that Simpson, Parker, and Perry had hidden items in that trash can, but Parker later told them that it was Simpson who put the items there.

{¶14} Days after the Granny D's incident, Simpson was implicated as the gunman by one of the witnesses to the shooting. One of the women standing near the victim told Lorain police officers that she believed the gunman was Simpson, a man she had known for many years because they grew up in the same neighborhood in Lorain. She explained that she recognized the man's distinctive "kind of ghetto limp" because the only person she had ever seen walk that way was Simpson. She also recalled that the gunman was of the same height and build as Simpson. Moreover, she explained that she had recently rejected Simpson's invitation to "hook up" with him and that the man who was killed at Granny D's was her boyfriend.

{¶15} The police also received information about the location of the black and silver gun that allegedly had been used in all three incidents. Several sources stated that Simpson had hidden the gun at the home of an acquaintance who lived on Root Road. Parker told them that he had again waited in Simpson's white rental car during the Granny D's incident, although he had believed at the time that Simpson had gone into the establishment to buy drugs, not to take money or hurt anyone. When Simpson returned to the car, he told Parker that he had to get rid of the gun because he had used it. Parker was with Simpson when he left the gun at the Root Road home.

{¶16} Police found a black and silver gun at the Root Road home, hidden by a bush near the garage. Ballistics testing confirmed that the gun was the weapon that had been used to shoot the victims at both Jack and Diane's and Granny D's. Todd Schill also confirmed that the weapon looked like the gun that was used during the robbery at Chapman's. The gun's owner, who then lived in Delaware County, Ohio, did not realize that his gun was missing until after the crimes. He had not seen his gun for five or six months, but had believed that it was still in the unlocked box in his closet where he kept it. Simpson was an acquaintance of the gun's owner

and had attended a birthday party at his home in Delaware County a few months earlier. The gun owner further explained that, during the party, he and Simpson had gone into the closet to smoke marijuana and that Simpson could have taken the gun without his knowledge. The gun owner did not know any of Simpson's alleged accomplices and stated that no one else from Lorain County had been to his Delaware County home. Numerous witnesses also reported seeing Simpson with the black and silver gun during the week that the crimes were committed.

{¶17} Simpson also implicated himself by asking his sister to hide evidence. Prior to the search of Simpson's family home, he called his sister from jail. During the recorded call, he told his sister where she would find his black Nike shoes and asked her to get them out of the house. Although his sister initially hid Simpson's black shoes, the shoes were later surrendered to the police. A search of Simpson's home recovered evidence that included tan cargo shorts, several pairs of white cotton gloves with rubber gripping dots, a black mask, and a black wool cap. A criminalist tested the gloves found at Simpson's home. Because the wear patterns of the rubber dots on that type of gloves have unique characteristics, he was able to determine that one of the pairs of gloves found at Simpson's home matched the glove impressions left on the cash register at Granny D's.

{¶18} Through three separate indictments, Simpson was charged for his alleged involvement in each incident. His indictment for Granny D's incident was tried separately and is not directly at issue in this appeal. For his alleged role in the Chapman's robbery, he was indicted with one count of kidnapping and one count of aggravated robbery with a firearm specification. For his alleged role in the Jack and Diane's robbery, Simpson was indicted with one count of aggravated robbery and one count of felonious assault, both with firearm and repeat violent offender specifications, and one count of having weapons under disability.

{¶19} The State moved to join the separate indictments for the crimes at Chapman's and Jack and Diane's, which the trial court granted. The trial court also granted the State's motion to admit limited evidence about the Granny D's incident. Following a jury trial, Simpson was convicted of all charges. Simpson appeals and raises four assignments of error.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO CONSOLIDATE TWO SEPARATE CASES FOR TRIAL IN VIOLATION OF MR. SIMPSON'S RIGHT TO A FAIR TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶20} Simpson's first assignment of error is that the trial court erred in consolidating the two indictments for trial. Simpson was indicted separately for these offenses and, prior to trial, the State moved to join the two indictments for trial pursuant to Crim.R. 13, which allows the court to join two or more indictments for trial if the offenses "could have been joined in a single indictment." Crim.R. 8(A) permits multiple offenses to be joined in a single indictment if they are "of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶21} Crim.R. 14 governs the joinder of offenses, whether in a single or separate indictments, for trial. *State v. Hatfield,* 9th Dist. Summit No. 23716, 2008–Ohio–2431, ¶ 14. Pursuant to Crim.R. 14, if it appears that the defendant is prejudiced by a joinder of indictments for trial, the trial court shall order separate trials or grant other relief. "To preserve a claimed error under Crim.R. 14, * * * a defendant must renew his * * * motion to sever either at the close of the State's case or at the conclusion of all of the evidence." *State v. Miller,* 9th Dist. Lorain

Nos. 10CA009922 & 10CA009915, 2012–Ohio–1263, ¶ 17.  A defendant's failure to renew his Crim.R. 14 motion "results in a forfeiture of the issue on appeal." *State v. Vu,* 9th Dist. Medina No. 11CA0042-M, 2012-Ohio-746, ¶ 37.

{¶22}  Although Simpson filed a written opposition to the State's motion for joinder, he does not dispute that he failed to renew his opposition at any point during the trial. Consequently, he forfeited any challenge under Crim.R. 14 absent plain error.  To rise to the level of plain error under Crim.R. 52(B), an error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings.  *State v. Tichon,* 102 Ohio App.3d 758, 767 (9th Dist.1995).   A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice. *State v. Bray,* 9th Dist. Lorain No. 03CA008241, 2004–Ohio–1067, ¶ 12.   Moreover, the decision of a trial court will not be reversed due to plain error unless the appellant establishes "that the outcome of the trial clearly would have been different but for the trial court's [alleged error]." *State v. Waddell,* 75 Ohio St.3d 163, 166 (1996).  Simpson has failed to argue, much less demonstrate, that the joinder of the two indictments was an error that rose to the level of plain error.  Although he briefly states on appeal that "the trial court's decision to join the two cases for trial was plain error[,]" he fails to articulate any argument as to why the joinder of the two indictments for trial was an error that resulted in a manifest miscarriage of justice, nor does he attempt to demonstrate that he would not have been convicted if the two indictments had been tried separately.

{¶23}  Simpson's primary argument is that the basis for his challenge to the joinder was Crim.R. 8(A), not Crim.R. 14, so he did not forfeit that challenge by failing to renew his challenge during the trial.  *See, e.g,  Hatfield* at ¶ 14 (recognizing that a challenge based on

Crim.R. 8, timely made prior to trial, need not be renewed at the close of the State's case). Simpson did not argue Crim.R. 8 to the trial court, however. *See id.* at ¶ 15. Although he briefly cited Crim.R. 8(A) in his written opposition to the State's motion to join the indictments for trial, he explicitly stated that his opposition to the motion "is made pursuant to Rule 14, Ohio Rules of Criminal Procedure," and that he "would be unduly prejudiced by joinder." Simpson's brief in opposition to joinder focused solely on arguing under Crim.R. 14 that a joint trial would be prejudicial to him, not that the multiple offenses were of dissimilar character or could not have been joined in a single indictment under Crim.R. 8(A). The trial court joined the two indictments for trial and trial proceeded without any further objection by Simpson to the joinder of the two indictments for trial. Because Simpson forfeited his Crim.R. 14 challenge on appeal and has failed to demonstrate that the trial court committed plain error by joining the indictments for trial, his first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO PRESENT EVID.R. 404(B) EVIDENCE IN VIOLATION OF MR. SIMPSON'S RIGHT TO A FAIR TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶24} Simpson's second assignment of error is that the trial court committed reversible error by granting the State's motion to present evidence about the June 23 crime at Granny D's. Simpson argues that, although some evidence about that incident may have been admissible to identify Simpson as the shooter, the State exceeded the permissible purpose of establishing the gunman's identity and instead used the evidence to prove that he was a violent man and that he acted in conformity with that bad character during the two incidents at issue in this case. *See* Evid.R. 404(B). Specifically, he points to statements during the State's closing argument when

it characterized the other crime as another example of Simpson terrorizing the citizens of Lorain by again going into an establishment and pointing a gun at the head of a robbery victim in front of witnesses.

**{¶25}** The record fails to support Simpson's argument that the trial court committed reversible error by allowing the other acts evidence. To begin with, Simpson failed to file any written opposition to the State's motion, and, even if he had, he failed to preserve this issue for appellate review by raising timely objections during trial when most of the evidence about the other incident was admitted. *See State v. Winston*, 9th Dist. Summit No. 24761, 2010-Ohio-1354, ¶ 12. Moreover, the record reflects that it was Simpson himself who elicited the most prejudicial evidence about the Granny D's incident that reflected his violent character: that someone was killed during that incident and that he was the killer.

**{¶26}** At a pretrial hearing, the trial judge explained the limited extent to which he would allow evidence about the Granny D's incident. He emphasized that, although he would allow some evidence about the incident, it would be limited so that its prejudicial impact on Simpson did not outweigh its probative value. To that end, the court informed the parties prior to trial, and repeatedly during the trial, that the State could only refer to the incident as another robbery or shooting, and could present evidence that it led to the discovery of the gun and the identity of Simpson and his accomplices. The judge informed the parties that he would not permit evidence that the shooting victim had been killed and, because the crime had been publicized in Lorain, the State would not be permitted to mention the name of the victim or the establishment.

**{¶27}** At that hearing, defense counsel raised no objection to the trial court's decision to allow the limited evidence. Instead, he informed the court that he and his client were in

disagreement about whether evidence about the Granny D's incident would help or hurt Simpson's defense. Counsel informed the court that he believed that his client's defense would be best served by opposing any evidence about the incident. Simpson personally informed the court, however, that he disagreed with his trial counsel and wanted to present evidence that Parker, his co-defendant in that case, admitted that he was a murderer. Simpson explained that he believed that Parker's apparent confession to murder was "key evidence" that should be presented to the jury in this case.

{¶28} During trial, defense counsel raised no objections as the trial court allowed limited evidence about the other incident. In fact, pursuant to his client's wishes, he proceeded to elicit even more information than the trial court's pre-trial ruling would have permitted. During the cross-examination of alleged accomplice Parker, defense counsel began to ask questions about Parker's felony convictions stemming from the 2007 incidents, and the trial judge immediately called a side-bar conference. The judge warned defense counsel that, if he intended to question Parker about his conviction of involuntary manslaughter, he might be opening the door to further evidence from the State that the June 23 incident had involved a murder, and that Simpson had been convicted of that crime. Defense counsel responded that he would discuss the issue with Simpson, "tell him the risk, and see what he wants me to do." Defense counsel later confirmed on the record that he had, in fact, discussed the issue with Simpson and that Simpson told him to "go ahead and ask it."

{¶29} After defense counsel asked Parker about his convictions of involuntary manslaughter and other June 2007 crimes, and whether he was testifying for the State in exchange for convictions of lesser crimes, the State followed up with more questions about those convictions. Specifically, the State elicited testimony from Parker to explain that his

involuntary manslaughter conviction had stemmed from his role as the getaway driver for the actual shooter.

{¶30} During his later cross-examination of a Lorain police officer, defense counsel attempted to discredit the information that the police had received from Parker by referring to some of the incriminating statements he had made about the June 23 incident. The trial judge called a sidebar conference to again warn defense counsel that was going to elicit more evidence that someone had been killed during the June 23 incident. Defense counsel responded that he had discussed the issue with Simpson, who insisted on asking about the fact that Parker had admitted that he was a murderer. Counsel further explained that the evidence went to the defense "theory of the case" that someone other than Simpson was the masked gunman during each incident.

{¶31} Defense counsel then proceeded to ask the officer about Parker's statements to police that, after the June 23 incident, he could not sleep because he had to look his father in the face and tell him, "I'm a f***ing murderer, man." On re-direct examination of the officer, the State asked him for an explanation of Parker's confession that he was a murderer. The officer explained that Parker considered himself a murderer because he had helped someone commit murder.

{¶32} Because it was Simpson himself who first elicited the testimony about a murder occurring during the June 23 incident, any error in the admission of that evidence was invited error. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 75. "The doctrine of invited error holds that a litigant may not 'take advantage of an error which he himself invited or induced.'" *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus. Given that

Simpson insisted that his trial counsel proceed with a defense strategy to elicit the most damaging evidence about the June 23 incident, he cannot now complain on appeal that the trial court committed reversible error in admitting that evidence. Simpson's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN GRANTING THE STATE'S REQUEST FOR A JURY INSTRUCTION ON ACCOMPLICE LIABILITY.

{¶33} Simpson's third assignment of error is that the trial court erred in instructing the jury on accomplice liability pertaining to his alleged role in the aggravated robbery and felonious assault at Jack and Diane's Lounge. Pursuant to R.C. 2923.03(A)(2), a person is guilty as an accomplice, rather than as a principal offender, if he aids or abets another in committing the offense while acting with the level of culpability required for committing the offense.

> To support a conviction for complicity by aiding and abetting * * * the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson,* 93 Ohio St.3d 240, (2001) syllabus. A complicity instruction is proper if "the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor[.]" *State v. Perryman,* 49 Ohio St.2d 14 (1976), paragraph five of the syllabus, overruled on other grounds by *Perryman v. Ohio,* 438 U.S. 911 (1978).

{¶34} Simpson argues that the jury could not have found him guilty as an accomplice to the robbery and shooting at Jack and Diane's because the State's sole theory was that he was the masked gunman. He asserts that there was no evidence before the jury from which it could reasonably conclude that someone else was the gunman and that he aided or abetted that person in committing the offenses at Jack and Diane's.

**{¶35}** Although the State's primary theory was that Simpson acted as the gunman at Jack and Diane's, the State's evidence to identify Simpson as the gunman at Jack's and Diane's was much weaker than the evidence proving that he was the gunman at Chapman's. None of the victims at the bar could identify Simpson as the shooter, nor was there evidence from them or other disinterested witnesses about the gunman having tattoos or other unique physical characteristics, nor could the victims recall much about the gunman's clothing. The victims recalled only that the gunman was dressed in dark clothing and that he was completely covered.

**{¶36}** Instead, the State's only witnesses to even potentially identify Simpson as the shooter at Jack and Diane's were Parker, Leonard, and the then-girlfriend of Perry. Each of these witnesses had a relationship with Simpson and his crimes and, therefore, the jurors had reason to question their credibility. Moreover, Simpson's theory throughout the case was that someone else was the gunman at each of the incidents. Through Simpson's own testimony and his counsel's cross-examination of the State's witnesses, Simpson attempted to discredit the testimony of his friends who had testified against him, particularly Parker. Simpson's primary emphasis was on Parker as the gunman because the evidence was undisputed that Perry was too short to match witness descriptions of the gunman being of average height. Parker, on the other hand, was about the same height and build as Simpson and, according to Simpson, they wore the same pants size. Simpson repeatedly referred to Parker's criminal history and the fact that he had reason to implicate Simpson as the shooter rather than himself.

**{¶37}** Parker admitted being involved in the incident, but he claimed that he waited in Simpson's rental car while Simpson robbed Jack and Diane's. Simpson, on the other hand, testified that he was not involved in any way and that all of the State's witnesses that testified otherwise were lying. Consequently, he argues that the jury was required to believe either that

he was the shooter or that he was not involved at all, as there was no evidence to support a conclusion that, if someone else was the shooter, Simpson assisted that person in any way. We disagree.

{¶38} Although Simpson denied any involvement in the incident and attempted to paint Parker as the shooter, and Parker insisted that Simpson was the shooter and he merely assisted him, the jury had reason to question the credibility of each of them and was free to believe some, all, or none of each of their stories. *State v. Szloh*, 189 Ohio App.3d 13, 2010-Ohio-3777, ¶ 29 (2d Dist.). There was evidence before the jury from which it could reasonably conclude that Parker was the gunman and that Simpson aided him by: driving him to and from the scene, providing the silver and black gun, and/or helping him hide the evidence.

{¶39} Several witnesses had implicated all four men as being involved in the robbery at Chapman's a few days earlier and stated that they had used Simpson's vehicle to drive to and from the scene. Perry's then-girlfriend testified that she had been with Simpson, Parker, and Perry in Simpson's white rental car near Jack and Diane's the day before the robbery and that she believed that they were planning to commit another robbery then, but Perry insisted that they take her home so she was not involved. Moreover, there was evidence from several witnesses, including Simpson himself, that Simpson, Parker, Perry, and sometimes Leonard regularly hung out together and that they always used Simpson's vehicle. In fact, there was no evidence before the jury that any of the other men even had a vehicle. If Simpson was not the shooter, the jury could reasonably conclude that he drove the shooter to and from the scene.

{¶40} Moreover, although the gun that shot the victim was found at a location where none of the men lived, Simpson was the only one who had a connection to the gun's owner. Simpson was the only one who knew the gun's owner, who lived in Delaware County, and was

the only person from Lorain County who had been in the closet where the gun was stored during the time that it went missing. Several witnesses, in addition to his alleged accomplices, testified about seeing Simpson with the silver and black gun that week. The jury had evidence before it to conclude that Simpson provided the gun that was used during the Jack and Diane's robbery, even if he was not the one who used it.

{¶41} After the Jack and Diane's robbery, the purse stolen from the bar as well as the pants and gloves apparently worn during that robbery were found in a trash can at Parker's home, not Simpson's, so the jury could conclude that the clothes were hidden at Parker's home because he was the one who had worn them. The police had also received an anonymous tip, as well as information from Parker, that Simpson had helped hide the items there.

{¶42} Given the evidence before the jury about the robbery and shooting at Jack and Diane's, the jury could reasonably conclude that, if Simpson was not the masked gunman, he had nonetheless assisted the gunmen in the commission of that offense. Consequently, Simpson has failed to demonstrate that an instruction on complicity pertaining to his role in the Jack and Diane's robbery was not warranted by the evidence. His third assignment of error is overruled.

**ASSIGNMENT OF ERROR IV**

THE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. SIMPSON'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶43} In his final assignment of error, Simpson asserts that his convictions are against the manifest weight of the evidence because the State failed to prove that he was the gunman at either Chapman's or Jack and Diane's. In reviewing a challenge to the weight of the evidence, the appellate court:

Must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶44} As detailed already, the evidence connecting Simpson to the robbery at Chapman's was overwhelming. In addition to the testimony of Parker and Leonard that Simpson was the masked gunman who robbed Chapman's, his identity was established through the testimony of numerous disinterested witnesses, who had no motive to falsely implicate Simpson. Todd Schill was able to describe the gunman's gun, clothing, and swirl-design tattoo on his left leg, all of which were later connected to Simpson. A patron at Timber's Bar saw Simpson there with his three accomplices and was able to identify Simpson as the one carrying the silver and black gun. She identified Simpson in court and was also able to describe the cargo shorts that he wore that night and the swastika and "White Power" tattoo on his upper arm. She also observed his maroon minivan in the parking lot. Amherst police confirmed that Simpson was dressed in the same clothing and driving the same minivan when he was later involved in a collision there. The testimony of these disinterested witnesses corroborated the testimony of Simpson's accomplices, Leonard and Parker, as did the videos from Chapman's, Timber's, and the Amherst police cruiser's dash cam.

{¶45} Although the evidence connecting Simpson to the crimes at Jack and Diane's came primarily from those who knew him and had potential connections to the crimes, it was for the jury to determine whether to believe those witnesses. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Simpson argues that he disputed their testimony and denied any involvement in the crimes, but the jury could have reasonably concluded that his

testimony lacked credibility. Although Simpson denied having any involvement in either incident, he offered no credible explanation for why he called his sister from jail to ask her to hide his black shoes.

{¶46} Moreover, Simpson's testimony that he was completely innocent and had no involvement in these crimes failed to explain how anyone else could have come into possession of the silver and black gun that shot the victim at Jack and Diane's and matched the description of the gun used at Chapmen's. The gun's owner lived several counties away and did not know Parker or any of the accomplices, and only Simpson had the opportunity to remove the gun from the owner's home. Several people had also seen Simpson with the gun during the week that these crimes were committed. Simpson's credibility was further undermined as he testified that several of the State's witnesses had lied when they testified against him, including police officers and the woman who saw him at Timber's Bar, who had never seen him before or since that night and had no apparent motive to lie.

{¶47} Reviewing all of the evidence before the jury, including a consideration of the credibility of the witnesses giving conflicting testimony, this Court cannot say the jury lost its way in convicting Simpson of the crimes committed at Chapman's and Jack and Diane's. His fourth assignment of error is overruled.

### III.

{¶48} Simpson's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
CONCURS.

BELFANCE, P. J.
CONCURRING IN JUDGMENT ONLY.

{¶49} Although I agree with the majority that Simpson failed to preserve his argument that joinder was improper in this case, I write separately to emphasize that Simpson's potential opposition to the joinder was two-fold. First, he could oppose the joinder of the indictments for trial by arguing that they could not be joined. Crim.R. 13 governs the joinder of indictments and provides, in relevant part: "The court may order two or more indictments * * * to be tried together, if the offenses * * * could have been joined in a single indictment * * *." Crim.R. 8 provides that offenses may be joined in a single indictment if the offenses "are of the same or

similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶50} The second potential challenge to joinder of Simpson's offenses for trial was to argue that, if the offenses were joined, he would be entitled to relief from prejudicial joinder under Crim.R. 14. Crim.R. 14 provides that "[i]f it appears that a defendant * * * is prejudiced by * * * such joinder for trial together of indictments * * * the court shall order an election or separate trial * * * or provide such other relief as justice requires."

{¶51} Simpson argues on appeal that the joinder failed to satisfy the requirements of Crim.R. 13 and Crim.R. 8, but he failed to raise such an argument in the trial court. He did not argue that the offenses were of dissimilar character or advance any other arguments that the standards permitting joinder could not be met pursuant to Crim.R. 13. Instead, he argued only that, if the offenses were joined, he would be entitled to relief from prejudicial joinder under Crim.R. 14. Because Simpson made no argument to the trial court that joinder was not proper under Crim.R. 13, he cannot raise that argument for the first time on appeal.

{¶52} I agree with the majority that this Court need not reach Simpson's prejudice argument under Crim.R. 14 because, although he raised that issue prior to trial, he failed to preserve it for appellate review. Simpson does not dispute that he failed to renew his Crim.R. 14 argument or move for severance at any point during the trial. He also failed to argue or demonstrate plain error.

APPEARANCES:

PAUL A. GRIFFIN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY SLANCZKA, Assistant Prosecuting Attorney, for Appellee.