[Cite as *State v. Parham*, 2019-Ohio-358.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-826 |
| v. | : | (C.P.C. No. 13CR-5703) |
| Clemon D. Parham, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

## D E C I S I O N

### Rendered on February 5, 2019

**On brief:** *Koenig & Long, LLC, Charles A. Koenig* and *Todd A. Long*, for appellant. **Argued:** *Charles A. Koenig.*

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, P.J.

{¶ 1} Defendant-appellant, Clemon D. Parham, appeals a judgment of the Franklin County Court of Common Pleas that sentenced him to 18 years to life imprisonment for aggravated robbery and felony murder. For the following reasons, we affirm that judgment.

{¶ 2} In this case, the state tried Parham for offenses arising from two separate incidents: (1) the robbery and beating death of Kevin Connal, and (2) the kidnapping and shooting death of Jermaine Hill. The jury found Parham guilty of the offenses arising out of the robbery and death of Connal; it found Parham not guilty of the offenses arising out of the kidnapping and death of Hill.

{¶ 3}    The state primarily relied on three witnesses, all former friends of Parham, to prove Parham's involvement in Connal's death.  One of those witnesses, Antoine Dotson, admitted to participating in the robbery and killing of Connal.  The other two witnesses, Quentin Brown and Gregory Dunson, testified as to what Parham had told them about the crime.  All three men testified in order to obtain favorable treatment when sentenced for the criminal charges pending against them.

{¶ 4}    Connal was a Florida-based concert promoter who convinced Parham to invest approximately $100,000 in a concert series to occur over the Memorial Day weekend in 2011.  Dotson, Dunson, and a third friend, Alex Daniels, all testified that the concert series flopped, and Parham lost his entire investment.  According to Dunson, Parham lured Connal to Columbus with the intent to recover his money or, if that failed, to kill Connal.

{¶ 5}    Connal flew to Columbus on the afternoon of August 19, 2011, and Parham met him at the airport.  Dotson testified that sometime that same afternoon, Parham called him and asked him to rob Connal.  Dotson agreed.  When Parham picked Dotson up that evening, he had with him Connal and Martin Wallington, another of Parham's friends.  Dotson sat next to Connal in the back seat of Parham's car while Parham drove to a remote area of the Bexley Woods Apartments' parking lot.  When Parham stopped the car, Dotson pulled a gun and ordered Connal out of the car.  Dotson forced Connal to strip, and he took a credit card and cash from Connal's pants pockets.  At that point, Parham and Wallington started punching Connal.  Connal fell to the ground unconscious, so Dotson kicked him to get him back up.  When Connal rose, Parham began punching Connal again and repeatedly asking where his money was.  Connal fell twice more during the beating.  The third time he fell, Parham jumped on his head twice with both feet.  Eventually, Parham, Dotson, and Wallington returned to Parham's car and drove away.  They left Connal, unconscious and bleeding, lying naked in the parking lot.

{¶ 6}    Later that night, Brown, one of Parham's friends, received a text from Parham asking Brown to come see him.  After Brown finished work at 2:00 a.m. on August 20, 2011, he met with Parham.  Parham drove Brown to where Connal lay in the parking lot of the Bexley Woods Apartments.  Parham told Brown that the dead man was the "[d]ude from Florida" and he did not intend for Connal to die.  (Tr. Vol. VI at 53.)  Later, Parham told Brown that Wallington and Dotson were involved in Connal's death.

{¶ 7}   Another of Parham's friends, Dunson, testified that Parham disclosed to him how Connal's death occurred.  According to Dunson, Parham said that he "drove [Connal] out towards Bexley Woods, got him out of the car, and they proceeded to beat him, * * * [and] all three of them, Martin [Wallington], [Parham], and [Dotson], were just beating him, kicking him, punching him, and that at the end [Dotson] took a rock and hit [Connal]." (Tr. Vol. VIII at 48.)  Parham also told Dunson that Dotson "took the guy's pants and his wallet and credit cards."  *Id.* at 49.

{¶ 8}   Parham testified and denied any participation in Connal's death.  Parham stated that he was playing video games at his home when Wallington arrived and announced that there was a problem.  Wallington then drove him to the Bexley Woods Apartments, where he saw Connal's body.

{¶ 9}   Connal's body was discovered around 7:00 a.m. on August 20, 2011 in the Bexley Woods Apartment's parking lot.  The medical examiner ruled Connal's death a homicide caused by blunt force trauma to the head.

{¶ 10} To prove Hill's kidnapping and murder, the state primarily relied on the testimony of Dunson, who related to the jury what Parham had told him about Hill and his death.  According to Dunson, Parham traveled to Atlanta to purchase a kilogram of powder cocaine from Hill.  Because the cocaine was heavily diluted, Parham had difficulty selling it and lost money.  Parham enticed Hill to fly to Columbus with the promise of purchasing more drugs.  Dunson testified that Parham "told [him] that he ordered Martin [Wallington] to shoot [Hill].  He said Martin shot him several times.  He said he had Martin shoot him, because Martin is the one who connected him with the guy.  So he wasn't going to do it, but Martin was, and he was there with him."  *Id.* at 65-66.

{¶ 11}  Hill was found shot to death in the basement of an abandoned house.  Parham denied any involvement in Hill's death.

{¶ 12}  After hearing all the evidence, the jury only found Parham guilty of the two offenses committed against Connal:  (1) aggravated robbery, in violation of R.C. 2911.01(A)(3), and (2) felony murder, in violation of R.C. 2903.02(B).  In a judgment dated November 2, 2016, the trial court sentenced Parham to three years imprisonment for aggravated robbery and 15 years to life imprisonment for felony murder.  The trial court

ordered that Parham serve each prison term consecutively, for an aggregate sentence of 18 years to life imprisonment.

{¶ 13} Parham now appeals the November 2, 2016 judgment, and he assigns the following errors:

> 1. Appellant was deprived of his due process right to a fair trial in violation of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, as a consequence of the trial court's joinder of appellant's two indictments for purposes of conducting a single trial of separate and [unrelated] offenses.
>
> 2. Appellant was deprived of his due process right to a fair trial in violation of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, as a consequence of the state's prosecutorial misconduct.
>
> 3. The trial court erred when it admitted expert opinion testimony and expert reports, in violation of Rule 702 of the Ohio Rules of Evidence.
>
> 4. The trial court erred when it permitted the state to place in evidence, as admissions of a party opponent, the unauthorized and inaccurate hearsay statements made by Appellant's prior attorney during his bond hearing.
>
> 5. The trial court erred when it failed to merge, for purposes of sentencing, appellant's convictions for Aggravated Robbery and Felony Murder arising from the same conduct and with the same animus.

{¶ 14} By his first assignment of error, Parham argues that the trial court erred in joining for trial the counts against him arising from Connal's death with the counts against him arising from Hill's death. We disagree.

{¶ 15} Originally, the indictment in this case charged both Parham and Dotson with aggravated robbery and aggravated murder with respect to Connal. In a separate indictment, the state also charged Wallington with aggravated robbery and aggravated murder with respect to Connal. Finally, a third indictment charged Parham and Wallington with kidnapping and aggravated murder with respect to Hill.

{¶ 16} The state moved to join all three indictments so all three defendants would be tried together for all the offenses allegedly committed against Connal and Hill. Parham

opposed that motion and, additionally, moved to sever his trial from Dotson's trial. After an omnibus hearing on the motions, the trial court determined that all defendants would receive separate trials, but Parham and Wallington would each face all charges against them as to both Connal and Hill in their respective trials. Parham later sought reconsideration of this decision, arguing that trial of the offenses he allegedly committed against Connal should be separated from trial of the offenses he allegedly committed against Hill. The trial court denied that motion.

{¶ 17} A trial court has the authority to join two indictments for a consolidated trial pursuant to Crim.R. 13. That rule states, "The court may order two or more indictments * * * to be tried together, if the offenses or the defendants could have been joined in a single indictment." Crim.R. 8(A) describes the circumstances under which multiple offenses may be joined in a single indictment. Under that rule:

> [t]wo or more offenses may be charged in the same indictment, * * * in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶ 18} " 'The law favors joining multiple criminal offenses in a single trial.' " *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶ 18, quoting *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). Permitting joinder "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158 (1988). However, even if Crim.R. 8(A) and 13 sanction the joinder of indictments for trial, a trial court should nevertheless order separate trials pursuant to Crim.R. 14 if the defendant establishes that joinder prejudices him or her. *Gordon* at ¶ 20. Importantly, in order to obtain severance under Crim.R. 14, the defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340, 343 (1981).

{¶ 19} The state may rebut a defendant's allegations of prejudicial joinder in two different ways. First, it may counteract the alleged prejudice by showing that it could

introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B) if separate trials occurred. *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). Second, the state may negate a claim of prejudice by showing "that evidence of each crime joined at trial is simple and direct." *Id.* The state need only make one of the two showings in order to overcome a defendant's claim of prejudice. *State v. Bass*, 10th Dist. No. 12AP-622, 2013-Ohio-4503, ¶ 13.

{¶ 20} Ordinarily, appellate courts review a trial court's decision on joinder of offenses for trial under an abuse-of-discretion standard. *Id.* at ¶ 6. Here, however, that standard does not apply because Parham failed to properly preserve his Crim.R. 8(A) and 14 arguments. With regard to Crim.R. 8(A), Parham did not oppose the state's motion to join on the basis that the state could not prove a Crim.R. 8(A) ground for joinder. Parham, instead, argued that Crim.R. 14 barred the trial court from joining the offenses against him because joinder would prejudice him. Given Parham's failure to raise an argument based on Crim.R. 8(A) in the trial court, we must review Parham's challenge to the joinder of the indictments for plain error. *See State v. Simpson*, 9th Dist. No. 12CA010147, 2013-Ohio-4276, ¶ 23 (applying the plain error standard to review whether the trial court erroneously joined indictments under Crim.R. 8(A) because, in the trial court, the defendant "focused solely on arguing under Crim.R. 14 that a joint trial would be prejudicial to him, not that the multiple offenses were of dissimilar character or could not have been joined in a single indictment under Crim.R. 8(A)").

{¶ 21} With regard to Crim.R. 14, Parham failed to renew his objection to the trial court's denial of severance at the close of either the state's evidence or all evidence. Parham, consequently, forfeited all error arising from the denial of severance save plain error. *State v. Morris*, 10th Dist. No. 18AP-208, 2018-Ohio-5252, ¶ 34; *State v. Sullivan*, 10th Dist. No. 10AP-997, 2011-Ohio-6384, ¶ 20; *State v. Burks*, 10th Dist. No. 07AP-553, 2008-Ohio-2463, ¶ 50.

{¶ 22} To prevail under the plain error standard, a defendant must establish that: (1) an error occurred, (2) it was obvious, and (3) it affected his or her substantial rights, i.e., it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Courts take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances

and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 23} On appeal, Parham primarily attacks the state's motion to join and asserts that there existed no Crim.R. 8(A) ground to join the indictments against him for trial. We disagree.

{¶ 24} As we stated above, pursuant to Crim.R. 8(A), a court may join indictments that include offenses "of the same or similar character."[1] Courts broadly construe the phrase "of the same or similar character" so that joinder of similar offenses is generally the rule, not the exception. *State v. Kennedy*, 1st Dist. No. C-120337, 2013-Ohio-4221, ¶ 26; *State v. Bennie*, 1st Dist. No. C-020497, 2004-Ohio-1264, ¶ 17. The offenses at issue need only be similar in nature, not identical in execution. *Bennie* at ¶ 18; *accord Bass*, 2013-Ohio-4503, at ¶ 9 (distinctions in the victims, locations, and times of the offenses "do not mean that the two indictments charge offenses of dissimilar character").

{¶ 25} Here, the state presented evidence that Parham lost money to both Connal and Hill, lured both Connal and Hill to Columbus on a pretext, and murdered them both, with his friends' assistance, soon after they arrived in Columbus. Parham points out differences in the crimes: Connal and Hill died in different locations and by different methods; Connal was robbed, but Hill was not; and the nature of Parham's business dealings with each decedent differed. While we do not discount the differences Parham identifies, they do not alter the underlying similar character of the offenses committed against both Connal and Hill. Therefore, the trial court did not err, much less commit plain error, in granting the state's motion to join the two indictments against Parham for trial.

{¶ 26} Next, Parham argues that the trial court erred in denying his motions to sever the Connal offenses from the Hill offenses. We are not persuaded.

{¶ 27} As we stated above, severance is not necessary if "evidence of each crime joined at trial is simple and direct." *Lott*, 51 Ohio St.3d at 163. Evidence meets the simple-and-direct standard if it is straightforward and uncomplicated enough that the jury can segregate the proof required for each offense. *State v. Clinton*, 153 Ohio St.3d 422, 2017-

---

[1] Parham asserts that the state failed to argue in the trial court that it could establish any of the Crim.R. 8(A) grounds for joinder. Parham is wrong. In its April 28, 2015 reply in support of its motion for joinder, the state argued that the trial court should join the indictments against Parham because the offenses charged were of the same or similar character.

Ohio-9423, ¶ 52; *Sullivan*, 2011-Ohio-6384, at ¶ 29. The evidence in this case satisfied the simple-and-direct standard. Neither killing involved a factual scenario so complicated that the jury could not parse the evidence of each crime separately. Moreover, the jury's decision to acquit Parham of the Hill offenses demonstrates that the jury applied the evidence to the appropriate offenses, and it did not, as Parham argues, combine the evidence to convict him. *See State v. Sutton*, 8th Dist. No. 102300, 2015-Ohio-4074, ¶ 25 ("[T]he jury's not guilty verdicts on several of the charges demonstrated the jury's ability to apply the evidence separately to each offense."); *State v. Evans*, 4th Dist. No. 10CA1, 2012-Ohio-1562, ¶ 38 ("Because the jury acquitted [the defendant] of one of the charges, we cannot find that the jury was confused by the evidence, overwhelmed by the number of counts, or influenced by the cumulative effect of the joinder."); *State v. Hall*, 10th Dist. No. 02AP-1198 (Sept. 30, 2003) ("[T]he jury's acquittal of appellant on the charge of improper discharge of a firearm [ ] and the firearm specifications indicates that the jury was able to apply the evidence to the appropriate counts."); *State v. Villa*, 2d Dist. No. 18868, 2002-Ohio-2939, ¶ 51 ("[A] jury's acquittal of a defendant on one or two charges establishes that the defendant was not prejudiced by the joinder of the charges against him."). Therefore, the trial court did not err, much less commit plain error, in denying Parham's motions for severance.

{¶ 28} In short, we find no error in the trial court's joinder of the two indictments against Parham or the court's denial of Parham's motions for severance. Accordingly, we overrule Parham's first assignment of error.

{¶ 29} We next address Parham's third assignment of error, by which he argues that the trial court erred in admitting Detective Robert Moledor's expert testimony and report into evidence. We are not persuaded.

{¶ 30} At the time of trial, Moledor was a police officer with the Columbus Division of Police assigned to the Federal Bureau of Investigation's ("FBI") Columbus Metro Violent Crimes Task Force. Moledor was also a member of the FBI's Cellular Analysis Survey Team ("CAST"). For this case, Moledor conducted a historical cell-site analysis, in which he used call detail records from cell phones and the locations of cell towers to approximate certain cell phones' locations at particular times.

{¶ 31} As Moledor explained, cell phones work by communicating via radio frequency with cell towers, also known as cell sites, operated by cell-phone service

providers.    When a cell-phone user makes a call or sends a text, the phone generally connects with the cell tower with the strongest, clearest signal.  Most of the time, that signal will come from the tower closest to the phone because the strength of radio frequency diminishes with distance.  However, a phone may connect to a tower farther away if the closest tower's signal is weakened due to obstructions, both natural and man-made; the height of the tower; wattage output; antennae angle and direction; the number of phones connected to the tower; and other factors.  Although a phone may connect to a tower further afield than the closest tower, a phone cannot connect to a tower if it is outside of the range of the tower's signal.

{¶ 32}  Generally, each cell tower has a 360-degree coverage area broken into three 120-degree sectors.  Each sector is oriented to transmit radio frequency in a particular direction.  For a variety of reasons, cell towers in urban areas generally have much smaller coverage areas than cell towers in rural areas.  In the fall of 2010, Moledor and another CAST member conducted a drive test in Columbus to determine the coverage area of various cell-tower sectors.   Based on the results of a drive test, the approximate geographical coverage area for a sector was three-quarters of a mile to one mile.

{¶ 33}  Each time a cell phone connects with the network the cell-phone service provider retains a record of which cell tower and cell-tower sector the phone connected with at the beginning and end of the call.  This record, called a call detail record, also includes the phone numbers of the phones involved in the communication, the date and time of the call, and the duration of the call.

{¶ 34}  Moledor collected the call detail records for cell phones owned by Parham, Connal, and Dotson for August 19 and 20, 2011.  Moledor then used the information in the call detail records to plot on maps the locations of the cell towers the phones connected with.  Moledor explained to the jury that the phones at issue were in the general vicinity of the designated towers at the times the phones connected with the towers.  The prosecutor used Moledor's testimony to argue that the movements of Parham's phone on August 19 and 20, 2011 corresponded with Dotson's and Brown's testimony regarding Parham's actions.

{¶ 35}  Prior to trial, Parham filed a motion in limine to exclude Moledor's testimony.  After a hearing, the trial court denied the motion.  The trial court also overruled Parham's

objection to the introduction of Moledor's report at trial. Parham now argues on appeal that the trial court erred in admitting Moledor's expert testimony and report because Moledor's opinions are based on an unreliable methodology.

{¶ 36} Trial courts have broad discretion in determining the admissibility of expert testimony. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 88. Consequently, an appellate court will only reverse a ruling admitting such testimony if the trial court abused its discretion. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 161.

{¶ 37} Evid.R. 702 governs the admissibility of expert testimony. Under that rule, a witness may testify as an expert if:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

The question in this case is whether Moledor's testimony satisfies the third criterion of Evid.R. 702(C), i.e., whether his opinion is reliable.

{¶ 38} The Supreme Court of Ohio has adopted the standard set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for adjudging the reliability of an expert's opinion. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998). This standard requires courts to assess reliability by considering: (1) whether the method or theory relied on has been tested, (2) whether the method or theory has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the theory or methodology has gained general acceptance in the scientific community. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶ 25; *Miller* at 611. The analysis of reliability is flexible, *Miller* at 611, and "none of these factors is a determinative prerequisite to admissibility." *State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998).

{¶ 39} Generally, in determining reliability, a court's overarching goal is to determine whether the reasoning or methodology underlying the testimony is valid. *Miller* at 611. "Proposed testimony must be supported by appropriate validation—*i.e.*, 'good

grounds,' based on what is known." *Daubert* at 590. Thus, where a party calls into question the factual basis, data, principles, or methods underlying an expert's opinion, the trial court must decide whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). "Relevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony." *Nemeth* at 211.

{¶ 40} Applying *Daubert*, we conclude that historical cell-site analysis satisfies the first factor, i.e., the methodology has been tested. The FBI created CAST to analyze call detail records and use those analyses in criminal investigations to locate cell phones. Moledor testified that CAST is frequently called to

> assist in situations where we are looking for a fugitive, people who have been kidnapped, children who are missing. [CAST] utilize[s] phone call[ ] records in much the same way as we're using right here, to provide this information as to where we might look for those people that we're trying to find, and [CAST] ha[s] time and time again located children, fugitives, victims, and bodies, using this exact technique.

(Aug. 15, 2016 Hearing Tr. at 95.) As another court stated, CAST's multi-year existence, "the thousands of mapping solutions it has created and law enforcement has successfully used for purposes * * * [of] finding missing persons, and the * * * CAST techniques * * * constitute field testing and demonstrate sufficient reliability to enter through *Daubert*'s reliability gate." *United States v. Davis*, S.D.Fla. No. 11-60285-CR-ROSENBAUM (May 17, 2013).

{¶ 41} Parham points out that historical cell-site analysis has not been the subject of peer review. However, peer review is not a prerequisite to admissibility. *Miller* at 613. "[W]hile peer review may be helpful, it is not absolutely necessary for an opinion to be admissible." *Id.*

{¶ 42} Moreover, despite the lack of peer review and a known error rate, historical cell-site analysis "has been subjected to publication and peer criticism, if not [actual] peer review." *United States v. Hill*, 818 F.3d 289, 298 (7th Cir.2016). "The advantages, drawbacks, confounds, and limitations of historical cell-site analysis are well known by experts in the law enforcement and academic communities." *Id.* This point, in fact, is confirmed by evidence that Parham submitted. (Def.'s Ex. 3, Ayers, Brothers, & Jansen,

National Institute of Standards and Technology, U.S. Department of Commerce, *Guidelines on Mobile Device Forensics*, Special Publication 800-101, Section 6.3, at 54 (Revision 1, May 2014) ("Call detail records can also be used with cell site tower information obtained from the service provider to translate cell identifiers into geographical locations for the cells involved and identify the general locale from which calls were placed. While plotting call record locations and information onto a map can sometimes be useful, it does not necessarily provide a complete and accurate picture. Cell towers can service phones at distances of up to 35 kilometers (approximately 21 miles) and may service several distinct sectors."))

{¶ 43} Parham also criticizes Moledor's testimony on the basis that Moledor assumes that cell phones always connect to the nearest cell tower. However, this criticism miscomprehends Moledor's testimony. In fact, Moledor explained to the jury that, although a cell phone will connect to the nearest tower most of the time, sometimes the strongest, clearest signal comes from another cell tower in range of a phone. Given this limitation in the methodology, Moledor could only narrow the location of a cell phone to a general area.

{¶ 44} While we acknowledge the inherent inexactitude of historical cell-site analysis, we do not find that inexactitude fatal to the admission of evidence developed using historical cell-site analysis. "These vagaries of cell phone technology affect the persuasiveness of the circumstantial evidence, but they do not render [an expert's] testimony inadmissible." *United States v. Rosario*, S.D.N.Y. No. 09-CR-415-2 (VEC) (Nov. 14, 2014); *accord United States v. Jones*, 918 F.Supp.2d 1, 5 (D.D.C.2013) ("[N]umerous [ ] courts have concluded that the mere existence of factors affecting cell signal strength that the expert may not have taken into account goes to the weight of the expert's testimony and is properly the subject of cross-examination, but does not render the fundamental methodology of cell set analysis unreliable."). The approach is consistent with *Daubert*, which held "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

{¶ 45} Based on the foregoing analysis, we join the multiple other courts that have concluded that historical cell-site analysis is accurate enough and well accepted enough to

allow admissibility. *See, e.g., State v. Wilson*, 8th Dist. No. 104333, 2017-Ohio-2980, ¶ 33 ("The same reliability challenge to expert cellular phone analysis testimony presently raised by [the defendant] has been rejected under both federal and Ohio law."); *State v. White*, 2d Dist. No. 26093, 2015-Ohio-3512, ¶ 28-29 (listing cases and concluding that "cell-site analysis testimony * * * is reliable"). We, however, caution parties that without a full and candid explanation of the limitations of historical cell-site analysis, the admission of such evidence may constitute an abuse of discretion. *See Hill*, 818 F.3d at 299; *United States v. Medley*, 312 F.Supp.3d 493, 502 (D.Md.2018). As Moledor provided such an explanation in this case, the trial court did not abuse its discretion in admitting his testimony and report. Accordingly, we overrule Parham's third assignment of error.

{¶ 46} By Parham's fourth assignment of error, he argues that the trial court erred in allowing the State to question him regarding a statement his former attorney made during a bond hearing. We disagree.

{¶ 47} Approximately four months after the trial court set Parham's appearance bond at $1.5 million, Parham's attorney, John Rutan, moved for a reduction in the bond amount. At the hearing on the motion, Rutan argued for lower bail on the basis that the facts did not support a charge of premeditated murder. In summarizing the facts for the trial court, Rutan stated:

> In fact, what happened is the victim came to Ohio to meet with Mr. Parham, to go to clubs, to do things of that nature. During the day, they hung out, going around and this, that, and other, here's this place, here's this bar.
>
> Around 11:00 at night, Mr. Parham is driving. One of the codefendants is in the front seat; the victim is in the back, and he pulls in his neighborhood. During this time, he runs into this Mr. Dotson guy, the culprit. He hops in the car. Where are you going to go?
>
> Oh, we're going to go to the codefendant's girlfriend's.
>
> That's why the body was found in that neighborhood, not because it was an elaborate plan. What happens, as they are driving there, Mr. Dotson decides to overreact. That guy -- that guy took 40 grand, 50 grand, whatever. Ah, hell, no.
>
> Pulls out a weapon, starts beating.

> Parham[:]  uh-oh, what's the hell this guy doing with a gun? Doesn't realize at the time the guy was beaten to death * * *.
>
> * * *
>
> [I]t's not murder, just because you don't stop a crime from happening.  He may not be the best human being in the world, but that doesn't justify a million dollar, two million dollar bail.  The reality of it is he didn't commit murder.  He didn't commit premeditated murder.  Does he have knowledge about the incident? Yes.  Was he present? Sadly.  But the bottom line is, was he the one initiating it?  Starting it?  It makes no sense.

(Apr. 15, 2014 Hearing Tr. at 5-6.)  After the bond hearing, Parham fired Rutan and obtained different representation.

{¶ 48}  At trial, Parham testified that he was not present when Connal was beaten to death.  Upon hearing that testimony, the state informed the trial court and defense counsel that it intended to cross-examine Parham regarding the statement his former attorney had made during the bond hearing.  Parham's counsel objected, arguing that the statement was inadmissible hearsay.  The state responded that the statement fell within the exception to hearsay contained in Evid.R. 801(D)(2) because it constituted an admission by a party-opponent.  The trial court overruled Parham's objection and permitted the state to proceed with its questioning.  The state's attorney then asked Parham, "[D]id your attorney, on your behalf, tell the court that you were present at the place and time of the Kevin Connal beating and subsequent homicide?"  (Tr. Vol. X at 274.)  Parham answered, "I believe he said something along those lines." *Id.*[2]

{¶ 49}  " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).  Certain types of statements may fit the definition of hearsay but, nevertheless, are not hearsay pursuant to Evid.R. 801(D).  Relevant to this case, under Evid.R. 801(D)(2)(d), a statement is not hearsay if it "is offered against a party and is * * * a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

---

[2] The state merely impeached Parham with Rutan's statement; it never offered the transcript containing Rutan's statement into evidence.  However, because the state intended the jury to consider the statement for the truth of the matter asserted, we review the admissibility of the statement under the hearsay rules.

{¶ 50} Trial courts have broad discretion to determine whether a statement is admissible under a hearsay exception. *State v. Dever*, 64 Ohio St.3d 401, 410 (1992). An appellate court will not disturb such an evidentiary ruling absent a clear abuse of discretion and a showing that the appealing party was materially prejudiced by the ruling. *State v. Issa*, 93 Ohio St.3d 49, 64 (2001); *accord McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, at ¶ 97 ("Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion.").

{¶ 51} Attorneys are agents for their clients. *State v. Waddy*, 10th Dist. No. 15AP-397, 2016-Ohio-4911, ¶ 56; *Boddie v. Van Steyn*, 10th Dist. No. 13AP-623, 2014-Ohio-1069, ¶ 13; *accord Ferron v. Ray*, 10th Dist. No. 00AP-699 (Dec. 21, 2000) ("An attorney-client relationship is, by its very nature, a relationship where the client controls the actions of the attorney, subject to the ethical constraints incumbent upon the attorney * * *."). Consequently, under Evid.R. 801(D)(2)(d), " 'statements made by an attorney concerning a matter within the employment may be admissible against the party retaining the attorney.' " *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555 (6th Cir.1986), quoting *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir.1981); *accord United States v. Gordon*, 4th Cir. No. 17-4483 (Nov. 7, 2018); *Fester v. Farmer Bros. Co.*, 49 Fed.Appx. 785, 797 (10th Cir.2002); *State v. Douglas*, 164 Ohio App.3d 467, 2005-Ohio-6144, ¶ 58 (6th Dist.); *State v. Haynes*, 9th Dist. No. 13258 (Mar. 9, 1988).[3] Even more specifically, a trial court may admit pretrial statements made by counsel, which have been added to the record in the course of pretrial proceedings, under Evid.R. 801(D)(2)(d). *United States v. Butler*, 496 Fed.Appx. 158, 160-61 (3d Cir.2012).

{¶ 52} Here, Rutan represented Parham during the bond hearing in which Rutan made the disputed statement. Rutan made the statement in the course of arguing that the trial court should reduce Parham's bond. The statement, therefore, is a statement by Parham's agent concerning a matter within the scope of the agency, made during the existence of the agency relationship. Thus, the trial court did not err in permitting the state's attorney to cross-examine Parham regarding Rutan's statement.

{¶ 53} In arguing to the contrary, Parham contends that Rutan did not have authority to admit to Parham's liability. This argument misconstrues Rutan's statement.

---

[3] Federal law construing a federal rule is persuasive authority in interpreting a similar Ohio rule. *Stammco, LLC v. United Tel. Co.*, 136 Ohio St.3d 231, 2013-Ohio-3019, ¶ 18. Here, we draw on federal law because Fed.R.Evid. 801(d)(2)(D) and Ohio Evid.R. 801(D)(2)(d) are substantially similar.

Rutan only conceded to Parham's presence at the scene of the murder; he did not state that Parham committed the murder.

{¶ 54} Additionally, for a statement to qualify as an admission under Evid.R. 801(D)(2)(d), the principal need not impart specific authorization to make the damaging statement; it need only authorize the agent to take action regarding the matter to which the statement relates. *Mowery v. Columbus*, 10th Dist. No. 05AP-266, 2006-Ohio-1153, ¶ 59. Parham authorized Rutan to represent him at the bond hearing and advocate for a lower bail amount. Rutan made the disputed statement trying to convince the trial court to reduce Parham's bail. While Rutan's argument failed, the factual statements he made related to that argument. Consequently, Evid.R. 801(D)(2)(d) exempts Rutan's statement from the hearsay prohibition.

{¶ 55} Finally, Parham maintains that Rutan's statement is inadmissible because it is protected by the attorney-client privilege. We reject this argument because the record does not support that Rutan relied on any communication from his client when stating that Parham was present when Connal was beaten. During his trial testimony, Parham denied telling Rutan that he was present. Rutan testified that he could not recall how he learned of Parham's presence, but it was not from Parham. Thus, the attorney-client privilege is inapplicable here.

{¶ 56} In sum, we find no error in trial court's decision to allow the state to question Parham regarding Rutan's statement. Accordingly, we overrule Parham's fourth assignment of error.

{¶ 57} We now return to Parham's second assignment of error, by which he argues that the prosecutor's misconduct denied him a fair trial. We disagree.

{¶ 58} When reviewing allegations of prosecutorial misconduct, a court must determine whether the prosecutor's conduct was improper and, if so, whether the conduct prejudicially affected the defendant's substantial rights. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 162. Because prosecutorial misconduct implicates due process concerns, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 238, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Prosecutorial misconduct will not render a trial unfair if, "in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury

would have found the defendant guilty even without the improper [conduct]." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 181.

{¶ 59} Parham first contends that the prosecutor engaged in misconduct when questioning witnesses. Parham primarily attacks the prosecutor's questioning of Aaliyah Dunson, Gregory Dunson's ex-wife. In 2011, Aaliyah Dunson overheard Parham and Dunson discussing a murder. Under direct-examination, Aaliyah Dunson testified that she heard Parham tell Dunson about "a gentleman who they had beat to death and left naked or half-naked in the apartment complex parking lot." (Tr. Vol. IV at 80.) On cross-examination, Parham's attorney clarified Aaliyah Dunson's testimony in the following colloquy:

> Q: * * * Ms. Dunson, you're not saying that Greg [Dunson] had anything to do with the homicides that we're here for, right?
>
> A: * * * [N]o.
>
> * * *
>
> Q: So when you testified on direct that they were talking about a beating that they had done, you weren't saying that Greg was saying that he was involved in a beating death, were you?
>
> A: No.
>
> Q: Really, what you heard was that there had been a beating, right?
>
> A: Yes.
>
> Q: [Parham] never said that he had beaten someone to death, right?
>
> A: I don't recall if he said specifically that he did it.

*Id.* at 91-92.

{¶ 60} The prosecutor then began her redirect-examination of Aaliyah Dunson by asking, "When you overheard the conversation between Greg and [Parham] and you heard [Parham] talking, was he talking like * * * someone who was involved in the beating death?" *Id.* at 112. Aaliyah Dunson answered, "Yes." *Id.* Soon thereafter, the following exchange occurred:

> Q: [A]s soon as you heard [Parham] admit to being involved in a beating death in an apartment parking lot, why didn't you go to the police right then?
>
> [Defense counsel]: Again, objection, Your Honor. She never said that she heard Mr. Parham admit to anything.
>
> THE COURT: Use another verb.
>
> Q: When you overheard the conversation where [Parham] admitted that --
>
> THE COURT: Don't use admit.
>
> [Defense counsel]: Thank you, Your Honor.
>
> [The prosecutor]: I'm sorry?
>
> THE COURT: Don't use admit.
>
> Q: When you heard [Parham] talk about being involved in a beating death of a man in an apartment parking lot, why didn't you go straight to the police --
>
> [Defense counsel]: Objection, Your Honor. The being involved is the same -- the same objection.
>
> THE COURT: Ms. Dunson, when you heard the conversation downstairs, why didn't you go to the police?

*Id.* at 114-15. After the conclusion of Aaliyah Dunson's testimony, at Parham's attorney's request, the trial court reminded the jury that if the court sustained an objection, the jury was to disregard the question that drew the objection.

{¶ 61} On appeal, Parham argues that the prosecutor erroneously incorporated into her question a fact not in evidence; namely, that Aaliyah Dunson heard Parham admit to being involved in a murder. " 'It is improper for an attorney, under the pretext of putting a question to a witness, to put before the jury information that is not supported by the evidence.' " *State v. Davis*, 10th Dist. No. 01AP-579, 2002-Ohio-1920, ¶ 63, quoting *State v. Smidi*, 88 Ohio App.3d 177, 183 (6th Dist.1993). However, we cannot fault the prosecutor here. Aaliyah Dunson testified that she could not recall if Parham said he committed the murder, but she also testified that Parham was talking like someone involved in the murder.

It appears that, in the heat of trial, the prosecutor construed the latter testimony as negating the former testimony. The prosecutor was mistaken: speaking in a manner that causes a listener to surmise the speaker was involved in a murder does not equate to an admission of involvement in the murder. However, given the subtlety of this point, we conclude that the mistake did not rise to the level of misconduct.

{¶ 62} Additionally, the trial court sustained Parham's attorney's objections to the question at issue and instructed the jury to disregard a question if the court sustained an objection to it. A court must presume that the jury followed the court's instruction. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 147. We, therefore, must presume that the jury ignored the substance of the question at issue. Consequently, we conclude that even if the prosecutor engaged in misconduct in the questioning of Aaliyah Dunson, that misconduct did not deprive Parham of a fair trial.

{¶ 63} Parham also points to multiple instances in the transcript where he contends the prosecutor improperly asked leading questions or suggested the answers she wanted in her questions. In about half of these instances, the trial court sustained objections to the questions at issue and the prosecutor either rephrased or withdrew the question. "As a general rule, when the trial court sustains objections to a leading question and the prosecutor rephrases the question, the defendant is not deprived of a fair trial." *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 49; *accord Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, at ¶ 171 ("The trial court sustained objections to the first two questions cited by [the defendant], so they cannot be the basis for a misconduct claim."); *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 209 (holding that no prejudice occurs when a trial court sustains an objection to a leading question and the prosecutor rephrases the question in a nonleading manner or does not repeat the question). Consequently, we conclude that, where the trial court sustained an objection to the prosecutor's question, the improper nature of the question did not prejudice Parham's substantial rights.

{¶ 64} In the remaining instances Parham directs us to, Parham did not object to the questions at issue. If a defendant fails to object to the alleged misconduct in the trial court, an appellate court reviews the claim of misconduct for plain error. *Mammone* at ¶ 111. Here, we find no plain error because the questions at issue either covered matters of

little relevance or elicited information introduced elsewhere during trial. *See Diar* at ¶ 170, 172, 180 (finding no plain error in leading questions where, in some instances, the testimony elicited had little to no relevance and, in other instances, the testimony elicited duplicated other testimony).

{¶ 65} Next, Parham contends that the prosecutor "improperly socialized with and prepped" Gregory Dunson. (Appellant's Brief at 36.) Parham also complains that the prosecutor offered to assist Dunson in obtaining court-appointed counsel after she discovered that Dunson had run out of funds to pay his attorney.

{¶ 66} During the trial, Dunson stayed in a hotel because he had moved out of state. The prosecutor picked Dunson up from his hotel and drove him to a Wendy's restaurant, where the prosecutor and Dunson discussed the matters Dunson intended to testify about at trial. A few days later, the prosecutor again picked Dunson up from his hotel and drove him to her office so she could prepare Dunson for trial. On the return trip to Dunson's hotel, the prosecutor stopped so Dunson could purchase pizza.

{¶ 67} While preparing Dunson for trial, the prosecutor played for Dunson a surveillance video showing Hill getting into a car at the Columbus airport and the car driving away. The car in the video matched a car Dunson previously owned in color, make, and model. Consequently, the prosecutor wanted Dunson to observe the car and note any differences between his car and the car in the video.

{¶ 68} "A prosecutor is free to prepare witnesses and review their expected testimony with them." *State v. McCoy*, 10th Dist. No. 99AP-1048 (Sept. 7, 2000). Here, there is no evidence that the prosecutor did anything untoward during her preparation of Dunson to take the stand. In fact, given the state of this record, defense counsel's accusations that the prosecutor engaged in misconduct during witness preparation are, at the very least, troubling to this court.

{¶ 69} Parham next claims that the prosecutor "improperly attacked a defense witness." (Appellant's Brief at 36.) This claim appears to arise out of the testimony of Steven Simons, Jr., a witness the state originally intended to call, but did not, because he told the prosecutor he did not make a statement attributed to him in an interview summary. According to Simons, the prosecutor became angry with him when he told her he never said that he saw Parham driving the car that dropped off Dotson on the night Connal died.

Simons alleged that, in retaliation, the prosecutor detained him in a conference room for approximately one hour and may have instigated the revocation of his probation.

{¶ 70} Regardless of the propriety of the prosecutor's alleged actions, they did not intimidate Simons. At trial, defense counsel called Simons to the stand, and he testified that he did not see the driver of the car Dotson exited on the night of Connal's beating. Consequently, no prejudice to Parham arose from the prosecutor's alleged treatment of Simons. In fact, Parham arguably benefitted from the incident, because his counsel used Simons' story to vilify the prosecutor.

{¶ 71} Next, Parham argues that the prosecutor committed misconduct when she questioned him regarding his former attorney's statement that he was present at Connal's murder. However, " 'it is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible.' " *State v. Tench*, ___ Ohio St.3d ___, 2018-Ohio-5205, ¶ 243, quoting *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 187. Because the trial court admitted the statement in issue into evidence, the prosecutor's questioning about that statement does not amount to prosecutorial misconduct.

{¶ 72} Parham also argues that the prosecutor lacked a good faith basis to question him about his former attorney's statement. "A cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists." *State v. Gillard*, 40 Ohio St.3d 226 (1988), paragraph two of the syllabus. Here, the prosecutor had such a belief because she had in her possession a transcript of Rutan's remarks during the bond hearing. Rutan's after-the-fact explanation of those remarks does not vitiate the prosecutor's good faith basis for her questioning.

{¶ 73} Finally, Parham contends that the prosecutor improperly stated during closing argument that Aaliyah Dunson testified that she heard Parham admit to murdering Connal. As we explained above, this statement mischaracterizes Dunson's testimony. However, appellate courts "view the state's closing argument in is entirety to determine whether the allegedly improper remarks were prejudicial." *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001). The prosecutor referred to Aaliyah Dunson's testimony only once during the closing argument, so the prosecutor's improper statement did not so permeate the state's closing that it denied Parham a fair trial.

{¶ 74} We also note that Aaliyah Dunson's actual testimony—that Parham talked about Connal's murder like someone involved in the murder—is consistent with her ex-husband's testimony. Gregory Dunson confirmed that Parham admitted to his involvement in Connal's murder during the conversation Aaliyah Dunson overheard. Thus, even without the prosecutor's mischaracterization of Aaliyah Dunson's testimony, it is clear beyond a reasonable doubt that the jury would have convicted Parham.

{¶ 75} In sum, we conclude that, despite any alleged prosecutorial misconduct that occurred, Parham received a fair trial. Accordingly, we overrule Parham's second assignment of error.

{¶ 76} By Parham's fifth assignment of error, he argues that the trial court erred in not merging his convictions for aggravated robbery and felony murder. We disagree.

{¶ 77} Pursuant to R.C. 2941.25:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

Construing this statute, the Supreme Court of Ohio has set forth a test for determining whether a defendant has committed allied offenses of similar import, which must merge in a single conviction prior to sentencing. Essentially, this test examines a defendant's conduct to determine whether the crimes at issue meet any of the criteria of R.C. 2941.25(B). Thus, a defendant may be convicted and sentenced for multiple offenses if: (1) the offenses are dissimilar in import or significance, i.e., each offense caused a separate, identifiable harm; (2) the offenses were committed separately; or (3) the offenses were committed with separate animus or motivation. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 31. A determination that any of these three criteria are met allows a trial court to impose a separate sentence for each offense a defendant is found guilty of. *Id.* Appellate

courts review a trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1.

{¶ 78} Here, the trial court determined that it could sentence Parham for both aggravated robbery and felony murder because Parham committed each offense with a separate animus. "Animus" means "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131 (1979). A court may infer a defendant's animus from the surrounding circumstances. *Id.* Where one offense is a predicate to another offense, a court may determine that the defendant committed the offenses with separate animus if the force used to commit the predicate offense is far in excess of the amount of force required to commit that offense. *State v. Oden*, 1st Dist. No. C-150387 (Sept. 23, 2016); *State v. Lee*, 10th Dist. No. 14AP-1009, 2016-Ohio-122, ¶ 17-19; *State v. Velez*, 8th Dist. No. 101303, 2015-Ohio-105, ¶ 10-11; *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 26-28; *State v. Metcalf*, 2d Dist. No. 24338, 2012-Ohio-6045, ¶ 14-16.

{¶ 79} Applying the above holding, we have affirmed the separate sentencing of a defendant for aggravated arson and felony murder where the defendant poured gasoline on the victim and set him on fire. *Albert* at ¶ 28. We concluded that the defendant's act was "far in excess of what [was] required to commit an aggravated arson and, given the circumstances, indicate[d] that [the defendant] participated in an act with a separate animus to kill [the victim]." *Id.* We applied the above holding to similar effect where a defendant was convicted and sentenced for both aggravated robbery and felony murder. In *Lee*, the defendant pointed a gun at the victim and demanded his belongings, and then shot the victim when he told the defendant to stop playing with the gun. We upheld separate sentencing for both offenses, stating that, "[a]s the act of shooting [the victim] was an additional act of force well in excess of that necessary to commit the robbery, the intent to kill was separate from the intent to commit the robbery." *Id.* at ¶ 19.

{¶ 80} Here, Dotson pointed a gun at Connal and forced him to strip and surrender his belongings. Parham, Wallington, and Dotson then viciously beat Connal. In the course of the beating, Connal fell to the ground unconscious, but Dotson kicked him to arouse him. Parham and Wallington punched Connal in the head throughout the beating. When Connal fell a third time, Parham jumped on his head with both feet twice.

{¶ 81} At the point Connal became unconscious, Parham, Wallington, and Dotson had inflicted the serious physical harm required to commit aggravated robbery under R.C. 2911.01(A)(3). However, the three men continued to beat Connal, leading to the coup de grace—the two stomps to Connal's head. Given these circumstances, the trial court could infer that Parham's immediate motivation changed over the course of the crime from robbery to causing Connal grave, life-threatening injury. Because the trial court could conclude that Parham committed aggravated robbery and felony murder with separate animus, the trial court could sentence Parham for both offenses. Accordingly, we overrule Parham's fifth assignment of error.

{¶ 82} For the foregoing reasons, we overrule Parham's five assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, J., concurs.
TYACK, J., dissents.

TYACK, J., dissenting.

{¶ 83} I do not believe a plain-error standard should be applied to the issue of joinder. Defense counsel cannot be reasonably expected to argue every conceivable reason for questioning a joinder. A trial court judge conducting a hearing on this issue can be expected to have knowledge of the various reasons why joinder is or is not permissible. I worry that when we, as an appellate court, go looking for reasons to apply a plain-error standard, we appear to be looking for reasons to affirm the defendant's conviction rather than making an impartial ruling about whether or not a criminal defendant got a fair trial.

{¶ 84} That being said, the jury here carefully weighed the evidence before it and acquitted Parham of the one murder charge. The evidence as to the second murder charge was fairly overwhelming. As a result, I do not believe that Parham was prejudiced by the joinder.

{¶ 85} I strongly disagree with the theory that a motion for relief from joinder must be renewed at the close of the State's case and/or at the close of all the evidence. If the judge grants relief at that point, there is a serious Double Jeopardy issue presented. The State may lose the opportunity to pursue either murder charge because the State insisted on a joint trial which proved to be an unfair trial. Again, an appellate court affirming the results

of an unfair trial because defense counsel did not renew the motion for relief from joinder case looks like an appellate court searching for a reason to affirm a conviction, not trying to assure that an accused had a fair trial.

{¶ 86} I also strongly disagree with the State using statements made by a former criminal defense counsel at a bond hearing as evidence in the actual trial of the criminal charges. I note that the defense counsel was fired immediately after the hearing on the issue of bond reduction. A criminal defendant cannot be expected to stand up and yell "that is wrong" when his or her lawyer says something wrong or not in the client's best interest.

{¶ 87} A layperson, especially a criminal defendant, has no control over what his or her lawyer says in open court. To suggest that a person with perhaps a minimal IQ and very limited knowledge of the law and court procedure controls what his or her lawyer says before a judge in open court is to make a suggestion which demonstrates an astonishing lack of reality of criminal trials and criminal defendants.

{¶ 88} I would sustain the fourth assignment of error. Because the majority of this panel does not, I dissent.

_____